We are now ready for our next case, Curling v. Secretary of State for the State of Georgia. Mr. Tyson, whenever you are ready. Thank you, Your Honor. May it please the Court, Brian Tyson. Thank you. May it please the Court, my name is Brian Tyson. I represent the Secretary of State and State Election Board in this matter. The procedural history of this case, Your Honors, is complicated at best, so I thought it might be helpful just to kind of summarize how we got to this point in this case. This case began in 2017 as an election contest to Georgia's 6th Congressional District Special Election. After it was removed to federal court, it was transformed into a challenge to the then method of voting in Georgia using direct recording electronic voting machines called DREs. The state, there was litigation for several years over that. After the state purchased new equipment in 2019, the district court entered an order saying you can't use the old equipment anymore, and then transformed the case into a challenge to the Dominion equipment that had been purchased by the state in 2019. Counsel, I don't want to tell you how to use your time, but you don't have a lot of it, so tell me what you'd like for us to reverse on. Certainly, Your Honor. So the first element is definitely the issue of standing. The district court found that there was standing for the plaintiffs in this matter based only on generalized grievances. So let's, I want to go to standing, but maybe in a different way that the district court looked at, although maybe the same. Let's talk about organizational standing. We have held, as I understand it in election challenges similar to this one or election challenges generally, that a diversion of resources theory for organizational standing is sufficient to allege injury in fact. That's correct. You agree with that? I do, Your Honor. Did they not allege a diversion of resources? Your Honor, the plaintiffs did allege a diversion of resources, the coalition itself. I think the issue we have here is the district court affirmatively prevented the state from examining the issues around the diversion of resources at the preliminary injunction hearing and relied only on some declarations and then the plaintiffs cite only declarations filed after the court's order in terms of the nature of the diversion of resources. There may be an error, you can show me in your brief, there may be an error of the district court in limiting you in discovery, but that's not how I understand this was presented to us. This was presented to us simply as there isn't evidence of standing. Is that right? Yes, Your Honor, that is correct. At least under the allegations and the affidavit presented by the executive director for the coalition, it seems to me that there is evidence of diversion of resources. Now, whether that evidence is sufficient, let's talk about, but it seems to me that there are at least allegations that, hey, we would have, but for this law, which we're now spending money to educate and to fight in some way, we would have spent money in Colorado doing auditing, in North Carolina doing election reform efforts, and I think South Carolina was another state that they do work in as well. Yes, Your Honor, and I think the key point is the nature of the generalized grievance still applies on the organizational standing and sufficiency because if you look at Harvard from the Sixth Circuit, they discuss how the generalized nature of the grievances affected all the nature of standing, the individual plaintiffs association. Diversion of resources isn't generalized to every voter. I mean, that's the issue with generalized, right, which is, and I think you might have a point with the individuals that theirs is the same as everyone, every other voter is, and they need something particularized or special as to them, but there's no one else who's claiming that I know of, but for this law, I would have spent money doing other election reform efforts elsewhere. This seems to be not general but specific to the coalition. Let me put it a different way. What do you identify specifically as different between this set of, this organizational plaintiff versus the dozens that we found standing for in other election cases? And, Your Honor, I think that the key difference is the only evidence in the record as far as the 990s are the coalition exists to litigate. That is its sole purpose. While there was a declaration of the contrary, and I think, again, the idea that So I looked at that, and I know you make that argument, but at least in their allegations, they say the executive director, it is alleged that the executive director would do education and other, now have to spend efforts on education, instruction, and litigation as a result, and otherwise would have done work on auditing and election reform efforts, which is not litigation related. So it seems to be, you might have a point of the only goal was litigation, and that's what they're doing, but this seems to be not that. This seems to be true diversion from at least something else. Yes, Your Honor. I'll make one last point, then I'll move on from this, but just I think it's important to consider, too, this court's post-2020 litigation. The idea that if an individual had merely incorporated, they could have transformed their generalized grievances into sufficient organizational standing, really by the act of incorporating, I think is a problematic view of how to look at Article III standing, but I'll move on to some of the other bases we have here. I've got a question, actually. Can you point me to an injunction related to the scanner issue? Yes, Your Honor. So I think the key issue is the specificity on Rule 65. The cases in Rule 65 focus on it was a district court that didn't call it what it did, an injunction, actually issuing an injunction. That's where most of the case law is on that. In this case, you have the district court saying three times that it is granting relief, that it is granting the motion for preliminary injunction. Those statements indicate the district court intended to enter an injunction, but it didn't specify what the requirements were. But didn't it ask the state for a proposed injunction? And I assume, I think I see in the record that you all provided that, but I don't see where one was ever entered. That's correct, Your Honor. There was never a specific threshold entered for the scanner. I think the key for the state is there have been multiple situations in this case and in the common cause case that was recently before this court where an injunctive relief of some sort was entered from the state's position. It didn't change anything the state was already doing. So, for example, the 2019 order in this case from the state's position, that just ordered the state to do what it was already supposed to do. It became the basis for a $6 million request for attorney's fees. So, from the state's perspective, we had to appeal this order because the district court clearly said it was entering an injunction as it related to the scanners. I'm not obviously saying that we would say what you want us to say about that. But given what you've just said, what would be your proposal for how the court would address this issue? And, Your Honor, I think the proper method at this point is to find that the scanner order violated Rule 65 specificity requirements, that if a district court was going to enter an injunction that later was going to contain later information, it needed to not say it was entering the injunction in that order. It needed to say it was considering entering the injunction, it was taking other steps, not that it was granting the PI. You're in a fine line here. Because on the one hand, if it's not specific enough to a certain point, we don't have appellate jurisdiction. And on the other hand, you want to tell us it's not specific enough but enough for appellate jurisdiction because it violates Rule 65. That is a perilous argument for you. As I understand your argument on appellate jurisdiction, and then we'll turn to Rule 65, it is that there was mandatory language requiring certain basic elemental things be done by a date certain. Is that true? Your Honor, there was the intent of the district court to enter an injunction. So Chief Judge Pryor's complaints— Beyond that, because I'm not sure that's enough. I'm not sure it's enough to say injunction granted, we'll talk to you later, which is what you're saying here. As I understand, here's what the order said, starting, I'll quote from page 142. The expanded methods to address the scanner, tabulator, and adjudication software's per se, blank exclusion of marks that may reasonably be considered by an adjudication panel as indicating voter intent must be in place no later than the next election cycle following the conclusion of the January 2021 runoff. So you have a date certain that something must be done and a baseline with which something must be done. There must be something different done that is currently the law or that currently exists to expand the method that the scanner tabulates such that an adjudication panel can determine voter intent. Right? That's correct. And then it says, the beginning of that sentence is actually, in any event, because in other words, what she first ordered you all to do is, you guys got to sit down. But she says, in any event, I am ordering this and further relief, not just relief, but further relief will come later. Is that a fair representation of the order? I think it's a fair representation, Your Honor. How's that not specific enough? And I think that in this case, it's not specific enough because it did not tell the state what it needed to do to avoid a contempt citation. Yeah, it did. Do something more than you're doing now. But do something more I don't think is specific enough for Rule 65 because what does more mean in this context? There's a discussion of a variety of different brightness settings, dots per inch settings, and the later filings show the plaintiffs only proposed remedies related to brightness settings, not anything else. Contempt requires an intentional, willful disregard of a court order. If the state had come and said, Judge, we've looked at this again, and we've now decreased the scanners to the 5% range, we couldn't agree, but this is what we've done there, no judge in the world could ever find that you willfully violated that order. But that order still would have caused you to go back and to do something to comply, right? I think it would, Your Honor, except that as Judge Justice Kavanaugh said in the Merrill v. Milligan case, elections are very complicated to run, especially statewide. The number of moving pieces that are happening here requires very specific direction for the court, not just go try again and go try to do something different. When the state had already done a study, it had already adopted a rule, there needed to be more specificity from our perspective to comply with Rule 65. Did you do anything in response to this order? Your Honor, I don't believe there was ever any action taken related to the scanner issue specifically. And did the plaintiffs raise that with the court? No, Your Honor. The plaintiffs took the position that this was not an injunction because the court never gave specific direction. I believe that's their position on appeal in this case as well. So my time remaining, let me move to Anderson Burdick because I think that's a key issue here. Let me ask you this. Yes, Your Honor. Assuming that the scan order is something we have no jurisdiction of, I can't understand really the only relief granted by this poll book order is that you have to update the paper backup through early voting. I cannot understand why you would not want to do that. And, Your Honor, the testimony at the hearing was this was actually a lot more complicated than the district court made it. And this kind of goes to our Anderson Burdick question on this point. There was a reasonable nondiscriminatory election rule in place. The state had paper backups. There was never a question those existed already. The only question was would it include… I have a legal question. Part of what drove the Anderson Burdick analysis, frankly, it's like with anything else, if you find a severe burden, you're going to lose. Is the determination of severity a factual determination or a legal determination for us? Your Honor, I believe it has to be a legal determination. It's going to be at least a mixed question of law and fact because the district court obviously goes on at length about all these possible malfunctions, things that county poll workers were doing that were not functioning. But at the end of the day, the theoretical vulnerability and the questions about possible malfunctions can't in and of themselves as a legal matter be a serious, severe burden on the right to vote because it's so unforeseeable. And, again, this is where these pieces mix together because at the end of the day, the plaintiffs haven't shown that this was certainly going to happen. They showed maybe it might happen. The state is entitled to administer its reasonable non-discriminatory election rules without the district court's interference. I'd like you to back up and finish answering Judge Anderson's question. I'm interested in that, too. Yes. So the key point is the list that was provided included voter registration information. So if a person presented their driver's license and they went to check in on the poll pad, the check-in unit wasn't working. The poll worker is supposed to consult the paper list, check the voter in, and allow voting to continue. The information on the poll pad includes information updated over the weekend regarding the absentee ballot status for a voter. Because of the nature of the printing schedule for those paper lists that the secretary undertakes, they cannot print those lists from the secretary's side in the weekend after the end of early voting and before Tuesday. So it may be a very good idea to include absentee information. That's something that maybe the state needs to look at. But at the end of the day, it wasn't up to the district court to use its Article III powers. You told the district court in a written statement that it was feasible. I'm sorry, Your Honor. I didn't hear the question. You told the district court that it was feasible to do that. You said it's not as simple as that, but it's feasible. Certainly, Your Honor. And I think this kind of goes back to where the New Georgia Project case was on a lot of this, too. There were a lot of good ideas around the administration of elections. The state has procedures. The fact that we'd have to print two different reports, I believe that filing said, and counties have to train poll workers how to use these alternate reports as well. That's a significant change to be happening, especially on the eve of an election. This is a lot more than a Purcell case, though, because I think as we saw, the scanner order was used by folks challenging the 2020 election to add an aura of credibility around these claims of a stolen election. And hewing closely to Article III we think is very important here and that these orders should be reversed. With your permission, I'll reserve the remainder of my time. Does anyone else have any questions before he sits? Okay. Thank you. Thank you, Your Honor. Mr. McGuire. Good morning. May it please the Court. My name is Robert McGuire. I represent the coalition plaintiffs, which is one of the two groups. Counsel, I'm going to jump right in because you don't have a ton of time. I'll tell you that, and I'm only speaking for myself, I think they're standing, and I think that there's appellate jurisdiction. So I'm very interested in the Anderson verdict, the merits issue. And so that's where my questions are going to go. And my first one related to the scanner order is this. Where is the evidence in the record, and point me to it because I didn't find it in the district court's order, that, quote, the average voter is likely unaware that their failure to adequately darken the oval to a certain percentage may cause their vote to be rejected by the scanner and, in turn, not counted altogether. That's at 129 and 30 of the district court's order. Your Honor, off the top of my head, I can't point you to where that evidence is, but I can say that I don't believe that evidence is necessary for the court to have entered a rule as it did on the scanners. Well, so here's why I think it is. Because the district court acknowledged right before that sentence that the burden is minimal, an argument whether there's a burden at all, but that the burden is minimal. That sentence, however, was the basis for the district court's finding, or it should be determination, that the burden was actually more than minimal because the average voter actually doesn't really know, despite the instructions, that they have to oval this thing in. So what I want to know is where in the record the district court determined what the average voter would understand, even though they were explicitly instructed to oval in a specific oval. That was not part of our proof that I recall. So what I will say on the burden is that I think the burden that the district court was talking about there was the burden of complying with the instructions to color in the oval. And that burden certainly is minimal, but the burden that's at issue in determining the issue here is the burden on the voter of having their vote not counted. And the reason I agree with you completely, you're right, but the point that the district court made is the reason why that burden is more than minimal is because the average voter wouldn't understand, despite the instruction, what they'd have to do and therefore wouldn't do it correctly. And what I want to know is where is the evidence to support that finding? Because that, to me, is the critical finding in the whole thing. To me, if there's not evidence to support that, that whole thing falls apart because then it becomes minimal and it's easy for the state to meet the burden. Well, again, I can't point you to exactly what evidence she had in mind in that particular passage of her opinion. Okay, so I want to go to the poll book order, what everyone's calling the poll book order. Let me ask you this. If Georgia law required that all polling places are required to have and to use electricity marked to the grid, to the hard-line grid, that was the statute, and on Election Day the power went out,  that, if that was the reason why the power went out, then there are emergency procedures which provide for people to cast ballots in that case. So the answer would be no. The answer would be no if that were the cause. Okay, correct. Let's assume that Georgia has a statute which says that every polling location in the entire state has to be hooked to some Wi-Fi system, and for whatever reason in the southeast on Election Day, the satellite goes down and all Wi-Fi drops. Would that be a severe burden on the right to vote? Well, I think the answer to this question, and in fact the answer to your former question, depends a little bit on the presumption that underlies those facts. We presume that electricity, the electrical power grid, functions normally and isn't routinely defective. If it were routinely defective, it would be a different answer. I would have given you a different answer to your previous question. Okay. So I think— So answer my Wi-Fi question. Well, it depends on whether there would be evidence that the Wi-Fi was routinely interrupted or routinely didn't function properly. If it did, if there was that evidence, as there is here— Assuming it normally works okay. Assuming that it normally works okay and there's not evidence, then I would think that the fact that you're using electricity and that's dependent on the system would not create a burden by itself. Okay, so let's take it to more tangible. Let's take it to here. So here there's a requirement that there be used iPads with an electronic polling system as part of the BMD system that you all are attacking, and that's the basis of the poll book order. How is that a severe burden that many of those just didn't operate correctly on Election Day? I think the burden for purposes of standing arises from you— I'm not talking about standing. I'm talking about whether it's severe or not. Whether it's a severe burden or not. I think you have standing. Okay, so apologies. Your question is whether it's a severe burden to use an iPad, for example? For the state to require that an iPad be used. I don't think there's any burden at all in the state requiring you to vote by a method that works. The burden arises when the method doesn't work. Right, but there's a risk that any method won't work on any given day. I mean, rain could happen so bad that it floods out a particular polling place. Is that a severe burden? Probably not, right? Well, that would— I mean, it obviously would be a burden to the voters that are affected. No, it's a burden that day, but is it a severe burden on the right to vote in the sense that we talk about for Anderson-Burnick? I think with the examples that you're giving, I think the proper answer is probably that these are burdens on the right to vote, but the issue is whether there's causation that's reasonably traceable to the defendant's conduct. Right, so wouldn't it be different if, say, the state put all the polling places in the places where they thought that their preferred party wouldn't get the vote in the floodplain, right? And they just expected that that was going to happen. That would certainly be different than a 100-year flood happens or even an ordinary flood, right, a pipe burst. Things happen. Why is this any different than things happen? So are we— May I address your question on the standing issue or on the merits issue? We're not talking about standing. Okay, we're just talking about merits. Yeah. So I guess what's confusing me is that the way we conceive of burden here is that the burden on the voter is the burden on the ability to vote, and the method of voting is not a burden unless the method results in depriving you of the ability to cast your vote. And so— Counsel, it seems to me the best answer you might have to questions asked by both Judge Luck and Judge Grant is something along the following lines. Obviously, a storm that knocks out all the power is not something that we could deal with in a court order. But the problem in this case, and your answer to them, it seems to me would be that there's a lot of evidence in this case and the evidence is that these poll books did not operate in three different elections, time after time after time. And there were numerous causes probably, but a considerable part of the cause probably was the lack of training, and in particular, the lack of training in how to use the backup, and in particular, the lack of training in the use of provisional ballots when emergency ballots should have been used. If they had referred to the backup, even though the poll book is not operating electronically, the backup would show that the voter is supposed to vote in this precinct and he should be allowed then to vote an emergency ballot and not a provisional ballot. Why is that not your answer to some of these questions anyway? Well, I think our answer, I certainly will accept that as an answer that I would be happy to give. I think what's causing me to stumble here is that  we're agnostic as to the method of voting, if the method of voting allows people to vote. It's the fact that the state is doing something which is failing to provide an updated poll book to take account of predictable failures. I understand that, but the method of voting, which includes all of that, is part of why the district court determined that it's severe. And the vagaries of any given day at any given time could affect the voting. If it's paper and for some reason the printer jam or the ink is disappearing or there's a paper shortage, like there is a shortage of a lot of other things going on in today's day and age, none of that would be called a severe burden, even though obviously it would interfere with the right to vote. Yes. You would agree? I would agree with that, although I would dispute that whether these are vagaries. I think that these are not the kind of vagaries of life that would appear to be just random. Technology not working? Technology not working in the course of— I've had that vagary just today, this morning, since I got here. It's certainly something that happens routinely in life, but it's not something that happens routinely in elections when you're running a system where you require technology to vote and then the technology itself has been proven repeatedly to be defective. The problem for us is that they are not providing a mitigation for that foreseeable problem. To our first question, do you know if the state or the county provides training to poll workers related to the poll books? I believe the counties provide the training directly. So could we, as a court, hold the state responsible for a lack of training on how to use the poll books? The state is, under Griswold v. Kemp, the state is the chief enforcement officer of the election code in Georgia, and so the state prescribes— That's not good enough under Jacobson, though. We were clear in Jacobson that it's not enough just to say, you're the chief election officer and you're responsible for all of it. You've got to drill down on who's responsible for what specific thing to determine redressability and traceability for standing. And that is why, also, we named Fulton County as a defendant in the case and why they were enjoined as well as the state was in this matter. So I see I'm over my time. We were going to divide time, so I can turn it over to my counsel unless you have more questions for me. Mr. Chan is going to be discussing the separateness of this case, the narrowness of this appeal. So I'm happy to answer more questions, or I can turn it over to him for him to address those. There's more time, so you all can decide. I would just conclude by saying, from the coalition plaintiff's perspective, we would request that you affirm the public order and lift the stay on it and dismiss the scanner order as unappealable. Thank you. Good morning, Your Honors. May it please the Court, Michael Chen for the Kerling plaintiffs, Donna Kerling, Donna Price, and Jeffrey Schoenberg. So can I pick up on a thread that your opposing counsel talked about? So in discussing some of the hypotheticals, including the electricity one and the Wi-Fi one, your opposing counsel said one reason the burden would not be severe because, for instance, if the electricity went out, the entire grid in the southeast on Election Day was Georgia very wisely has an alternative paper ballot system for emergency ballots that are actually counted, they aren't provisional, you just check off the poll book. Here, I understand the poll books aren't updated to the nth degree, but they have a list, a paper list of the voting rolls, and they have voting ballots. How, even if the electronic system is so unreliable, does that not take care of any severity with regard to the burden? It doesn't take care of it because there is still a burden imposed by forcing voters to vote provisionally instead of on the emergency ballot. So the emergency system, I think you both are at pains, and the district court is at pains to say it's not a provisional system. And I tend to agree with you on provisional. There is, as I understand it, three votes. There's regular on the electronic, there's emergency votes if the electronic system goes down, and going down means lines of 30 minutes or more, the electricity goes off, something like that, defined by regulation. And then provisional for those who, for some reason, the poll book is not updated and they can't, they're listed in the wrong place. Is that correct? To be honest, Your Honor, I'm not sure because these were the coalition plaintiff's claims. But what I do know from the district court's order is that there is evidence that voters were required to vote provisionally, and that does impose a burden on those voters. And let me just make one more point about this question about the vagaries of life. You know, one way you can think about this is the magnitude of the burden. And there I would say that if a voter doesn't get to vote or has to vote on a provisional ballot, that is a severe burden on that voter. But I think the problem is counsel, and I'm sorry to interrupt, but that's true of the electricity example. It's true of the Wi-Fi example. It's true if there's a one in a hundred year flood. It's true of lots of things that we don't call a severe burden. That's true, Your Honor. And two differences I would point out in this case. One, it's as if the flood or the leak in the roof happened year after year in every single election. Then I think you would say that there is a severe burden on the voters. The second point I would make is that I think those issues are better dealt with on the other side of the ledger of the Anderson-Burdick balancing test. It's the state's interest. The state does have a severe interest not having to plan around a hundred year flood. But if the problem is easily avoidable just by printing what they're already printing just at a later date, it's a minimal burden on the state. And that's why the Anderson-Burdick analysis comes out in our favor here. We don't look at it that way. In other words, we don't say, well, this is a really good idea, and it doesn't cost the state so much, so we're going to require that. That's not what this is about. What this is about is, is the fact that it's not updated by about three or four days, is whatever minimal harm that is to the right to vote balanced against whatever state interest has in doing so? And it seems to me that it's really minimal to say that we're going to print it out this day as opposed to this day, and that might affect a really small handful that might have to vote provisionally whose votes will end up being counted anyway. And, again, we're only talking about the case of emergency. I think, Your Honor, that ultimately it is a balancing test. And so regardless of whether you're labeling it a severe burden or a minimal burden, you still have to balance the burden on voters who will not get to vote or will have to vote provisionally against a minimal state interest on the other side. If I could just address this. Are we supposed to go back there to the conference room and hash it out amongst ourselves what we would do if we were in the Georgia legislature, what we think would be the most effective way to make the line shorter and the voting easier? Is that what the Supreme Court has said we should do? No, Your Honor. It's a balancing test like many other constitutional frameworks. It's a well-established balancing test under Burdick-Anderson, and the district court had the full record before it. It assessed these, and the question is just whether the district court committed some error, and I don't think the state defense have pointed to one. If I could just address the scanner order briefly. There is no appellate jurisdiction because the district court entered no injunction. Judge Luck, you pointed to a line in the district court's order where it talked about expanded methods, but in the very next sentence, the district court explained that those methods would be identified through further proceedings. No, it says it would grant further relief after you guys sat down together, but it set the standard. It said you must do something by a certain date, and it told the state what that something was. It says you need to expand the method such that a, I forget what the board, whatever the board who looks at these, can reasonably determine voter intent. How is that not a directive to do something? And let's assume the state did nothing. So this piggybacks off Judge Grant's question. Let's assume the state said, I'm not doing anything until we sit down and we can't agree, so we're at a standstill. I'm not doing anything. You're telling me you wouldn't run to the court to say, you said in any event they had to do something by this date and they didn't do it, so require it? So two things, Your Honor. First, I respectfully disagree with your reading of the district court's order. I think the further relief in the next sentence is talking about the expanded methods, and that's clear in context of the district court's order. Why use further? Doesn't further imply that it granted relief? No, Your Honor. Really? Yes, Your Honor, because there is no instruction to the state defendants in this order. So it's not just the absence of that language. It's the presence of the district court clarifying that it would hold further proceedings to identify what the relief was. Did the plaintiffs, any plaintiff, file asking the district court to enter an injunction? Yes, Your Honor. There were further proceedings after this order. Each side submitted their proposed remedy, and very importantly, the district court issued a further order. It's at Docket 1021 where it further deferred proceedings on the remedy. So the district court was clear in both Order 964 and in 1021 that it had not yet entered anything. The date certain, Your Honor, Judge Luck, was it was after it said after the January 2021 elections. It didn't say do anything by January 2021. It said after, and that's even clearer taking into account Order 1021. But let me also address Judge Luck's point about the practicalities of the situation and how the parties have behaved because I think that removes any doubt. State defendants conceded this morning. They have done nothing differently because— Counsel, I want to go back to what you said. You're way over time, but that needs to be corrected, what you just said. On page 142, it says, must be in place no later than the next election cycle following the conclusion of the January 2021. It didn't just say in some date in the future. It said next election cycle. Your Honor, it said not the January 2021 elections. Yes, the next election after. That's a date certain. But, Your Honor, taken in context, especially with Order 1021, what the district court was doing was deferring proceedings on the remedy. And again, you know that by how the parties have acted. The state defendants haven't changed their conduct. They never sought a stay of that order, which they would have done if they thought they were under some sort of injunctive order, if they thought they were under order of contempt, because that's what they did with the poll book order, which was an injunction. I have a question about what interests both of the parties might have, all of the parties might have, besides what happens with the scanners. Your friends on the other side indicated a concern about attorneys' fees. Is that something that changes depending on what we decide about whether this is appealable? Your Honor, to be honest, I'm not in a position to answer that because this was the coalition plaintiff's motion. I'm just here to underscore the limited nature of this court's appellate jurisdiction and this appeal. If it's not your motion or your party isn't concerned about it, then why are you here talking to us about it? My client's concern is, again, to underscore the limited scope of these appeals because state defendants have made broad arguments that affect my client's interests, for example, on the ballot marking device claims. And so I just want to be clear about— The ballot marking device claim was a coalition claim. Isn't that what you just said? I'm sorry. I represent the curling plaintiffs. Both the curling and coalition plaintiffs brought ballot marking device claims. The reason that I'm here today on behalf of the curling plaintiffs is because the state defendants made arguments regarding the ballot marking device claims, and our response to that is that's not at issue in this appeal, this court shouldn't address it, and that the appellate jurisdiction, even over the scanner order, is limited. I don't have a view on the attorney's fee question that Your Honor identified. To my knowledge, there haven't been proceedings on attorney's fees as to the scanner order in the district court, and so I think that's something that would be resolved in future litigation. Thank you. Thank you. Mr. Tyson, you have three minutes. Thank you, Your Honor. I think that what we've heard is the kind of evidence is unnecessary idea that we can just look and see there's problems and therefore the state has responsibility and also erase IPSA theory of election administration. I think what the court sees here is there's not a flipping of the burden. It's not the state's burden to disprove that there are problems. I think you need to address Judge Anderson's question, and what Judge Anderson's question was in giving a very articulate response to questions that I had and Judge Grant had, which is that at some point when the flood happens every single time and you don't change the polling place, at some point when the electricity goes out on election day every single time, is the state not then charged with doing something and not charged with the burden being severe by not doing something? I think that's really the question you have to answer. And I think that if there can show a kind of duty over time that is being violated, if you know for certain, for example, to Judge Grant's question, that you always place the opposing party's political precincts in an area where things are likely to go wrong. I think we have, though, really at root in that problem. So I agree, number one, that that could be a claim. I don't want to say that's not correct. I think we get back to our Jacobson traceability, redressability problem, though, because what we find in Georgia elections is there's a matter of statute and practice counties run elections. So I have to say I'm very familiar with Jacobson, and I'm familiar with Florida's system. So I did a lot of digging, and I don't know how you get around, and please tell me how you do. The Georgia statute, and I'm talking about 21-2-300 in all of its glory, quote, the equipment used for counting votes in counties, states, and federal elections shall be the same in each county of the state and shall be provided by the state as determined by the Secretary of State. The Secretary of State determines the method of voting. Absolutely, the Secretary of State does. That's different than Florida. That is different than Florida, but I think the key distinction that is the same as Florida is county officials still carry out the training of the poll workers. By the state, there's a statute, Georgia statute, that says that the Secretary of State is responsible for training the election superintendents in each county. So I think the ultimate duty of training falls on the Secretary of State, and the Secretary of State certainly has authority, it seems to me, to direct the superintendents of election in each county as to the kind of training that needs to happen, which the evidence in this case shows they need to train them about use of the backup. Oh my goodness, I apologize for that. I'll ask you a question while he's doing that. Was there evidence discussed about the nature of the Secretary's training of the election supervisors? Was that a part of the case? No, Your Honor, that is a part of it. Some other cases that are going on in the northern districts, but I would agree with Judge Anderson that the Secretary has a duty to train county superintendents. The county superintendents then, by statute, as we cited in our brief, have the authority and responsibility to train the poll workers. And so this has never been a failure-to-train case. This has always been an Anderson-Burdick, equal-protection-style case, and I'm not aware of any evidence in the record related to the training of the Secretary of local election officials. We won't hold Judge Anderson in contempt on his last day. But my question here is something your opposing counsel said, which is that unlike Jacobson, part of the problem in Jacobson was they only sued the Secretary of State. But they didn't do that here, right? They had a county official. In fact, they had the person responsible for county elections that was before the court, correct? The Fulton County, one single county, yes, Your Honor. Right. So at least as to that county, and I agree with you, that might affect the scope of the injunction, but at least as to that county, they had every redressable and traceable party, did they not? Your Honor, I would agree that if you have a county election superintendent in the case, then you can properly bind that county. You may be in a Bush versus Gore problem for the under 158. I don't disagree that it might go to the scope of the injunction and problems with that, but at the very least, when we're talking about standing, they at least would have standing with regard to that claim as to that county, correct? I believe that would be correct as to that county, Your Honor. I want to make sure I understand something that you said. Has training – I know training has been mentioned in the briefing. Has training been part of the relief sought in this case? Your Honor, the district court has ordered training in several different orders along the way. I believe the 2019 order included some training relief. Standing here today, I don't recall anything from the record in terms of training of local election officials that was testimony during the various preliminary injunction hearings. There's been four different rounds of preliminary injunctions in this case. What about has this paper voter list been presented as a mitigation for a lack of training? Not that I recall in that way, Your Honor. It's always been presented as there is a severe burden on the right to vote by not including this information on the paper backups that are in the polling places. Any more questions? All right. Thank you, Your Honor. Thank you all for your arguments. It's been a great help to the court. We are in recess until tomorrow morning at 9. All rise.